United States District Court
Southern District of Texas

**ENTERED**

June 15, 2023

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHELSEA DAVIS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-3328 |
| | § | |
| ARCHROCK, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this gender discrimination case is Defendant Archrock, Inc.'s ("Archrock") motion for summary judgment. (Dkt. 17). The Court has carefully reviewed the briefing, the summary judgment record, and the relevant caselaw and will **GRANT** the motion.

### I.     FACTUAL BACKGROUND

Plaintiff Chelsea Davis ("Davis") is suing Archrock under Title VII of the Civil Rights Act of 1964 ("Title VII") for gender discrimination, retaliation, and creating a hostile work environment. (Dkt. 1 at pp. 5–6). She has also pled a claim for retaliation under the Texas Commission on Human Rights Act ("TCHRA"). (Dkt. 1 at pp. 6–7). The following facts are drawn from Davis's deposition and its attachments, which comprise the entire summary judgment record.

Davis started working for Archrock as a temporary contract employee in June of 2019. (Dkt. 17-1 at pp. 136–37). In November of 2019, Archrock's chief financial officer made Davis a permanent employee in the company's accounts payable department on the

recommendation of Nina Ramirez ("Ramirez"), who interviewed Davis for the permanent position and became her supervisor. (Dkt. 17-1 at p. 182). Davis worked in Archrock's accounts payable department, supervised by Ramirez, until she voluntarily resigned on January 6, 2021. (Dkt. 17-1 at pp. 101, 147–48, 188).

Davis and Ramirez seem to have worked well together, at least at times. In June of 2020, Ramirez sent an email to Davis thanking her for her hard work:

Chelsea,

Thank you for an amazing job you do everyday. I really appreciate all your hard work.
Dkt. 17-1 at p. 186.

Davis responded with a kind email of her own:

Thanks Nina that means a lot; I really appreciate you as a Manager☺
Dkt. 17-1 at p. 186.

However, Davis testified in her deposition that she ultimately resigned because she "felt forced out" by Ramirez. (Dkt. 17-1 at pp. 146–47). According to Davis, the problems between her and Ramirez "started in August" of 2020, when Archrock, which had been a remote workplace since the beginning of the COVID-19 outbreak, began requiring 50 percent of its workforce to return to the office. (Dkt. 17-1 at p. 41). Davis, who has two children, could not return to the office in August of 2020 because her older child's school was still closed and she was unable to find an affordable child care option. (Dkt. 17-1 at pp. 9–11, 41). Davis's child care difficulties were not alleviated even when schools reopened because Davis's older child began the 2020-2021 school year learning remotely. (Dkt. 17-1 at p. 189).

During the last few months of 2020 and the first week of 2021, Davis made multiple requests for permission to work from home for significant periods of time on account of problems finding affordable child care; all of those requests were granted. The first request came in the form of a September 24, 2020 email from Davis to Ramirez in which Davis said that she needed to work from home until November 9, 2020 because her daughter would be remote learning until then:

> Nina,
>
> I've contacted my daughter school and they said November 9th will be the next time I can change her back from online to campus. I tried to get them to send me some type of letter they won't just letting you know.

Dkt. 17-1 at p. 189.

Ramirez granted the request:

> Chelsea- this is fine. We can revisit again in Nov and see if any changes need to be made. Approve to work from home due to your kids school schedule.

Dkt. 17-1 at p. 189.

After the first work-from-home request, Davis consulted with Archrock's human resources department about child care options. Archrock's human resources manager emailed Davis the contact information for the company's insurance carrier's employee assistance program ("EAP"). (Dkt. 17-1 at pp. 190–91). Davis contacted the EAP representative, who provided Davis with the contact information for several child care providers. (Dkt. 17-1 at p. 154). When Davis contacted the recommended providers, she found that they were either "full" or "out of [her] price range[,]" so she hired a nanny. (Dkt. 17-1 at pp. 154, 193).

Davis's second work-from-home request came in the form of a November 12, 2020 email from Davis to Ramirez in which Davis said that she needed to work from home the following week because she was going to have to let her nanny go:

> Nina,
>
> The nanny I hired to watch my children isn't working out her schedule interferes with mine and she's trying to make changes on our arrangement. I won't be able to work at the office next week 11/16 -11/20 I'm trying to find other alternatives for childcare. I'm off tomorrow and will try to work out something. I'll keep you posted but any chance I get I'll try making it to the office.

Dkt. 17-1 at p. 195.

Ramirez granted that request as well:

> Chelsea,
>
> Sorry to hear that your nanny isn't working out. Next week will be fine just keep me updated on your days you can work prior to coming into the office. Good luck on your nanny search.
>
> Thank you for the notice.

Dkt. 17-1 at p. 195.

A third work-from-home request came at the beginning of 2021. On December 29, 2020, Ramirez emailed her subordinates and informed them that every member of her team would be required to come back to the office permanently after the new year. (Dkt. 17-1 at pp. 52–53). Davis texted Ramirez on January 2, 2021, which was a Saturday, and requested permission to work from home the following week because "[t]he e-mail notice from [Ramirez] that went out 12/29 was too late of a notice and not enough time for [Davis] to find child care coverage." (Dkt. 17-1 at p. 53). Davis further explained in her text that "[c]hild care rates ha[d] gone up" due to COVID and that she saw "no other choice but to resign" if it was "mandatory to work from the office permanently[.]" (Dkt. 17-1 at pp. 53–

54). In a text on January 3, 2021, Ramirez responded that Davis could "[g]o ahead and work from home [the following] week to find day care[.]" (Dkt. 17-1 at pp. 53, 55). Ramirez added:

> It's my understanding that HR has provided you with day care info. Work through the list this week, and talk to me at the end of the week.
> Dkt. 17-1 at p. 55.

Davis "panicked" because she "was afraid they were about to let [her] go." (Dkt. 17-1 at p. 146). She resigned on January 6, 2021, three days after receiving Ramirez's text. (Dkt. 17-1 at pp. 147–48, 188).

During her time at Archrock, Davis was never disciplined, suspended, placed on a performance improvement plan, or warned that her job performance was deficient. (Dkt. 17-1 at pp. 101–03). On the contrary, she received good job performance evaluations and was given a raise in March of 2020, only four months after she was hired on permanently. (Dkt. 17-1 at pp. 99, 103). She never reported any discrimination, harassment, or retaliation to Archrock's human resources department, even though she was aware that Archrock's company policies encouraged employees to report discrimination, harassment, or retaliation to "the human resource department or any other member of management the individual fe[lt] would be appropriate." (Dkt. 17-1 at pp. 117–26). Her resignation letter cited increasing childcare costs as the reason for her departure and did not mention discrimination, harassment, or retaliation. (Dkt. 17-1 at p. 188).

Nevertheless, Davis testified in her deposition that she "felt discriminated against" because Ramirez "showed favoritism to those that she liked the most." (Dkt. 17-1 at p. 107). According to Davis, Ramirez "gave [her favorites] the right to manage other

employees when they were on the same level as [those] other employees." (Dkt. 17-1 at p. 126). Ramirez also "took [her favorites] out to lunch frequently and treated them frequently." (Dkt. 17-1 at p. 126). All of Ramirez's "favored" employees were female. (Dkt. 17-1 at pp. 107, 126). Davis also testified that Ramirez allowed another employee to work exclusively from home; that employee was female, as well. (Dkt. 17-1 at pp. 61–62).

Most of Davis's coworkers were women, but Ramirez also supervised two men. Davis testified that Ramirez treated one of the men "really bad" and "like[d]" the other, but she provided scant information apart from that. (Dkt. 17-1 at pp. 167–68).

Davis further testified that Ramirez increased Davis's workload significantly after Davis talked to Archrock's human resources department about child care in October of 2020. (Dkt. 17-1 at pp. 141, 153, 168–71). Davis testified that she believed that the increase in her workload was retaliatory. (Dkt. 17-1 at p. 141). Davis also testified that Ramirez said, at a company charitable event in 2020, that "she would be letting five people go from the department[,]" which created "tension" and "pressure" among Davis's group. (Dkt. 17-1 at pp. 75, 129). At one point, according to Davis, Ramirez also "said that if anybody burned her, she would burn them back." (Dkt. 17-1 at p. 118). Davis took this to mean that Ramirez was attempting to "put fear in the staff" by threatening retaliation "if we spoke to HR about anything." (Dkt. 17-1 at p. 118).

## II.   LEGAL STANDARDS

### a.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient

showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the

non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the non-movant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). And Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

### b.  Title VII

Title VII prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII also makes it unlawful for an employer to retaliate against employees who have opposed discrimination or who have

engaged in "protected activities." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001).

Unlawful discrimination under Title VII can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.* 271 F.3d 212, 219 (5th Cir. 2001). Because Davis sets forth no direct evidence of disparate treatment, her claims are analyzed using the *McDonnell Douglas* test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

### i. *Disparate treatment*

Disparate treatment on the basis of a protected characteristic is a violation of Title VII. Where a plaintiff does not provide direct evidence of discrimination, Title VII claims proceed under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp.*, 411 U.S. at 802–05. "Analysis under the well-established *McDonnell Douglas* framework proceeds as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action; and if that burden is satisfied, (3) the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination." *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Par.*, 327 F. App'x 472, 482 (5th Cir. 2009).

To establish a prima facie case under the *McDonnell Douglas* framework, Davis must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than "similarly situated" employees who were not members of her protected

class. *See, e.g., Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004). Once a plaintiff establishes a prima facie case of discrimination, the burden of production of evidence shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 615 (5th Cir. 2009)).

If the employer meets its burden of production, the burden then shifts to the plaintiff to "produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (quoting *Laxton v. Gap, Inc.*, 335 F.3d 572, 578 (5th Cir. 2003)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

### ii.   *Hostile work environment*

To establish a claim of hostile work environment under Title VII, Davis must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) Archrock knew or should have known of the harassment in question and failed to take prompt remedial action. *Johnson v. PRIDE Industries, Inc.*, 7 F.4th 392, 399–400 (5th Cir.

2021). Harassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

Courts determine whether a hostile work environment exists using a totality of the circumstances test that focuses on the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). The Supreme Court has emphatically stated that Title VII is not "a general civility code"—"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and quotation marks omitted). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," and in order to be actionable under Title VII the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id*. at 787–88.

### iii.   Retaliation

Title VII forbids retaliation against individuals who oppose discrimination or participate in certain Title VII processes. 42 U.S.C. § 2000e-3(a). To establish a prima facie case for retaliation under Title VII, Davis must show that: (1) she engaged in activity protected by Title VII; (2) Archrock took adverse employment action against her; and (3)

a causal connection exists between the protected activity and the adverse employment action. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).

Protected activity can consist of either: (1) opposing any practice made an unlawful employment practice by Title VII; or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. *E.E.O.C. v. Rite Way Service, Inc.*, 819 F.3d 235, 239 & n.2 (5th Cir. 2016). To be considered an adverse action in the context of a retaliation claim, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

As with traditional discrimination claims, courts employ the *McDonnell Douglas* burden-shifting framework to analyze Title VII retaliation claims. "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 388–89 (5th Cir. 2007) (internal citations omitted).

### iv.  The TCHRA

Because the general purpose of the TCHRA is to "provide for the execution of the policies of Title VII," Texas courts rely on federal law to interpret that statute. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308–09 (Tex. 2010). Accordingly, the Court

will discuss only Title VII law when evaluating Davis's claims. *See Hernandez*, 670 F.3d at 650.

### III.   LEGAL ANALYSIS

Davis has not established a triable fact issue on any of her claims.

### a.  Davis has not raised a genuine issue of material fact on her disparate treatment claim.

As stated above, to establish a prima facie case for disparate treatment, Davis must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than similarly situated employees who were not members of her protected class. *See, e.g., Bryan*, 375 F.3d at 360. On this record, her disparate treatment claim fails at elements three and four.

#### i.  *Constructive discharge*

As to element three, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (quoting *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)). In her summary judgment brief, Davis acknowledges that she was not fired, demoted, or denied leave and that she resigned from Archrock voluntarily; but she contends that she was constructively discharged. (Dkt. 19 at pp. 11–12).

"A resignation is actionable under Title VII . . . only if the resignation qualifies as a constructive discharge." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001). "To prove a constructive discharge, a plaintiff must establish that the working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Id.* (quotation marks omitted). Courts in the Fifth Circuit consider the following factors when determining whether an employee was constructively discharged:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.
> *Id*. (alteration omitted).

"Demonstrating constructive discharge imposes a high burden." *Robinson v. Waste Management of Texas*, 122 Fed. App'x 756, 758 (5th Cir. 2004). The Court must conduct a "holistic review of the workplace" that "takes into account only the specific conditions imposed by the employer; the subjective state of mind of the employee is irrelevant." *Id.* "The test that [Davis] must meet is an objective, 'reasonable employee' test: whether a reasonable person in the plaintiff's shoes would have felt compelled to resign." *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 650 (5th Cir. 2004). Moreover, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir. 1987) (quotation marks omitted; emphasis in *Dornhecker*); *see also, e.g., Robinson*, 122 Fed. App'x at 759 ("A reasonable employee would, at the very least,

formally seek the position before resigning, or at least seek to remedy the situation with the employer.").

The record does not contain sufficient evidence to create a triable fact issue on Davis's claim of constructive discharge. In her summary judgment response, Davis claims that she "testified to unbearable working conditions and feeling humiliated by her supervisor." (Dkt. 19 at p. 13). However, how *Davis* felt about her working conditions and about Ramirez is irrelevant; to create an issue of fact for a jury, she must present evidence showing that a *reasonable person* in her shoes would have felt compelled to resign. *Haley*, 391 F.3d at 650. Here, the evidence shows that, between September of 2020 and January of 2021, Davis made at least three separate requests to work from home for a week or longer, all of which were granted—Davis was, in fact, working from home with Ramirez's permission when she resigned. Davis was never disciplined, suspended, placed on a performance improvement plan, or warned that her job performance was deficient. Davis received good performance evaluations and at least one raise, and she never notified Archrock's human resources department—not even in her resignation letter—that she was experiencing discrimination, harassment, or retaliation. Although Davis's deposition contains testimony arguably showing that Ramirez was callous about possibly having to let five people go and was vindictive toward people who had "burned" her, a plaintiff's "exposure to a rude, demanding boss" does not on its own "render her employment intolerable so as to support a claim of constructive discharge." *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.*, 139 F.3d 532, 540 (5th Cir. 1998), *overruled on other grounds by Burlington*, 548 U.S. 53 (2006).

A holistic review of Davis's workplace does not provide evidence showing that a reasonable person in Davis's shoes would have felt compelled to resign. Accordingly, Davis has not met the high burden of showing that she was constructively discharged.

### iv.    *Similarly situated comparators*

Additionally, Davis has not pointed to evidence showing that she was treated less favorably than similarly situated male employees. To establish disparate treatment so as to present circumstantial proof of a discriminatory motive, a plaintiff must demonstrate that a similarly situated employee outside the plaintiff's protected class was treated differently. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405–06 (5th Cir. 2005). For employees to have been similarly situated, those employees' circumstances "must have been nearly identical." *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (quotation marks omitted). "As its phrasing 'nearly identical' suggests, the Fifth Circuit narrowly construes the 'similarly situated' requirement." *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 & n. 33 (W.D. Tex. 2007) (collecting cases).[1]

---

[1] The cases cited by Judge Montalvo in footnote 33 of his opinion illustrate how stringent the "similarly situated" requirement is. *See, e.g., Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (finding insufficiently identical circumstances where the terminated white plaintiff and a black manager who remained employed had the same supervisor, were both company directors, and were both accused of removing company assets at relatively the same time; the Court of Appeals noted that the white plaintiff lied repeatedly during the course of the company's investigation, while the black employee admitted her actions; in addition, the value of the property the black employee removed was "dramatically less" than the property the white plaintiff removed); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (finding that the plaintiff had not shown "nearly identical" circumstances merely because he produced evidence that white and black employees in the same position had scrapped parts due to the employee's operator error or poor workmanship, but were not disciplined; the plaintiff had not shown that the undisciplined employees had, like him, a history of poor work performance and scrapped parts damage amounting to $8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (concluding that the plaintiff had not shown "nearly identical" circumstances because the

Davis testified that all of Ramirez's "favored" employees were female, as was the one employee who was allowed to work exclusively from home. Davis testified that two members of her group were male, but there is no evidence in the record showing either that those male employees were similarly situated to Davis or that those male employees were treated more favorably than Davis. In fact, Davis testified that Ramirez treated one of the male employees "really bad."

The record contains no evidence showing that Davis was treated less favorably than similarly situated male employees. Accordingly, the evidence in the summary judgment record does not establish a triable fact issue on Davis's gender discrimination claim.

> **b.  Davis has not raised a genuine issue of material fact on her hostile work environment claim.**

Davis's hostile work environment claim fails for similar reasons. To establish a claim of hostile work environment under Title VII, Davis must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) Archrock knew or should have known of the harassment in question and failed to take prompt remedial action. *Johnson*, 7 F.4th at 399–400. "[C]onduct must be extreme to amount to a

---

employee outside plaintiff's protected class who allegedly received more favorable treatment did not have the same supervisor); *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (determining that the plaintiff and the employee outside her protected class who allegedly received preferential treatment were not similarly situated where the employer discharged the plaintiff because the plaintiff violated its non-fraternization policy and the other employee's conduct did not involve the employer's non-fraternization policy).

change in the terms and conditions of employment," and in order to be actionable under Title VII the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787–88.

The record contains no evidence that Davis was subjected to extreme, objectively offensive conduct or, more importantly, that any such conduct was directed at her because she is a woman. Moreover, there is no evidence showing that Archrock knew or should have known of any harassment and failed to take prompt remedial action. Accordingly, the evidence in the summary judgment record does not establish a triable fact issue on Davis's hostile work environment claim.

### c.   Davis has not raised a genuine issue of material fact on her retaliation claim.

Finally, the summary judgment record does not show that a triable fact issue exists on Davis's retaliation claim.[2] To establish a prima facie case for retaliation under Title VII, Davis must show that: (1) she engaged in activity protected by Title VII; (2) Archrock took adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *Zamora*, 798 F.3d at 331.

Protected activity can consist of either: (1) opposing any practice made an unlawful employment practice by Title VII; or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. *Rite*

---

[2] Davis's summary judgment brief does not discuss her retaliation claim and does not point to any evidence in the record to support it.

*Way*, 819 F.3d at 239 & n.2. In order to make the first type of case—an "opposition" case—Davis must show that she "had a reasonable belief that [Archrock] was engaged in unlawful employment practices." *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981). "[T]he reasonable belief standard recognizes there is some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *Rite Way*, 819 F.3d at 242. However, the belief must be objectively reasonable; a showing of subjective good faith alone is insufficient. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000). In order to make the second type of case—a "participation" case—Davis must show that she participated in "a formal EEOC proceeding" before the adverse employment action. *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 49 (2d Cir. 2012) (collecting cases); *see also Byers*, 209 F.3d at 428 ("In the instant case, the 'participation clause' is irrelevant because [the plaintiff] did not file a charge with the EEOC until *after* the alleged retaliatory discharge took place.") (emphasis in *Byers*).

There is no evidence in the record with which Davis could prove that she held an objectively reasonable belief that Archrock engaged in gender discrimination. There is no evidence showing, for instance, disparate treatment of men and women or showing that offensive gender-related conduct (or offensive conduct of any kind) was directed at Davis. Accordingly, there is no evidence in the summary judgment record on which Davis could base an "opposition" case. Moreover, there is no evidence showing that Davis participated in a formal EEOC proceeding before she left Archrock, so there is accordingly no evidence in the summary judgment record on which Davis could base a "participation" case.

IV.     **CONCLUSION**

Archrock's motion for summary judgment (Dkt. 17) is **GRANTED**. All of Davis's claims are **DISMISSED WITH PREJUDICE**. The Court will issue a separate final judgment.

SIGNED at Houston, Texas, on June 15, 2023.

_George C. Hanks Jr_

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE